UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------ X
ROBERT KRINGE,                             :   Case No.: _____
                                           :
       Plaintiff,                          :
                                           :   **DEMAND FOR JURY TRIAL**
  -against-                               :
                                           :
ASTA FUNDING, INC., GARY STERN,            :
LOUIS A. PICCOLO, DAVID SLACKMAN,          :
TIMOTHY BISHOP, and MIKE                   :
MONTELEONE,                                :
                                           :
       Defendants.                         :
------------------------------------------ X

## COMPLAINT

Plaintiff, Robert Kringe ("Plaintiff") by his undersigned attorneys, for this Complaint against Defendants, alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, the investigation of counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This is an action brought by Plaintiff against Asta Funding, Inc. ("Asta Funding" or the "Company") and the members of the Company's board of directors (collectively referred to as the "Board" or the "Individual Defendants" and, together with Asta Funding, the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff also asserts a claim against the Individual Defendants for breaching their fiduciary duty of candor/disclosure under state law. Plaintiff's claims arise in connection with the

proposed acquisition of Asta Funding by the Stern Group through its affiliates (collectively the "Stern Group") (the "Proposed Transaction").

2. On April 8, 2020, and as amended on June 25, 2020 Asta Funding entered into an agreement and plan of merger (the "Merger Agreement"), pursuant to which Asta Funding shareholders shall be entitled to receive $13.10 in cash for each share of Asta Funding common stock owned (the "Merger Consideration").

3. On August 25, 2020, in order to convince Asta Funding's public common shareholders to vote in favor of the Proposed Transaction, the Defendants authorized the filing of a materially incomplete and misleading definitive proxy statement (the "Proxy") with the SEC, in violation of Sections 14(a) and 20(a) of the Exchange Act.

4. In particular, the Proxy contains materially incomplete and misleading information concerning: (i) the Company's financial projections; and (ii) the valuation analyses performed by the Company's financial advisor, Lincoln International LLC ("Lincoln"), in support of its fairness opinion.

5. The special meeting of Asta Funding's shareholders to vote on the Proposed Transaction is currently scheduled for September 25, 2020 (the "Shareholder Vote"). Therefore, it is imperative that the material information that has been omitted from the Proxy is disclosed prior to the Shareholder Vote, so Plaintiff can properly exercise his corporate voting rights.

6. For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9, and breaches of the duty of candor/disclosure. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction until the material information discussed below is disclosed to Asta Funding's shareholders sufficiently in advance of the Shareholder Vote or, in

the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act and breach of the duty of candor/disclosure.

## JURISDICTION AND VENUE

7. This Court has original jurisdiction over this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

8. The Court has supplemental jurisdiction over the state law claim for breach of the duty of candor/disclosure pursuant to 28 U.S.C. § 1367.

9. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice. "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." Sec. Inv'r Prot. Corp. v. Vigman, 764 F.2d 1309, 1315 (9th Cir. 1985). "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court." Id. at 1316.

10. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391 because Defendants are found or are inhabitants or transact business in this District. Indeed, Asta Funding's common stock trades on the Nasdaq Global Select Market ("NasdaqGS"), which is headquartered in this District, rendering venue in this District

appropriate. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11.     Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Asta Funding common stock.

12.     Defendant Asta Funding is engaged in several business segments in the financial services industry including funding of personal injury claims, through our wholly owned subsidiaries Sylvave, LLC, Simia Capital, LLC and Arthur Funding LLC, social security disability advocacy through our wholly owned subsidiaries GAR Disability Advocates, LLC ("GAR") and Five Star Veterans Disability, LLC and the business of purchasing, managing for their own account and servicing distressed consumer receivables, including charged off receivables, and semi-performing receivables.  Asta Funding's common stock is traded on the NasdaqGS under the ticker symbol "ASFI."

13.     Individual Defendant Gary Stern is, and has been at all relevant times, a director of the Company, Chairman of the board, and Chief Executive Officer.  He is also the controller of the Stern Group.

14.     Individual Defendant Louis A. Piccolo is, and has been at all relevant times, a director of the Company.

15.     Individual Defendant David Slackman is, and has been at all relevant times, a director of the Company.

16.     Individual Defendant Timothy Bishop is, and has been at all relevant times, a director of the Company.

17. Individual Defendant Mike Monteleone is, and has been at all relevant times, a director of the Company.

18. The Defendants identified in paragraphs 13 through 17 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with Asta Funding, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background of the Company and the Proposed Transaction**

19. Asta Funding is primarily engaged in the businesses of acquiring, managing, servicing and recovering on portfolios of consumer receivables. The Company operates through four segments: Consumer Receivables, Personal Injury Claims, Structured Settlements and GAR Disability Advocates. The Consumer receivables segment is engaged in purchasing, managing for its own account and servicing distressed consumer receivables, including charged off receivables, semi-performing receivables and performing receivables. The Personal injury claims segment includes the operations of its subsidiary, Pegasus Funding, LLC. The Structured settlements segment includes the operations of CBC Settlement Funding, LLC (CBC). The GAR Disability Advocates segment includes the operations of GAR Disability Advocates, LLC (GAR Disability Advocates). GAR Disability Advocates is a social security benefit and disability advocacy group.

20. Asta Finance Acquisition, Inc. is a Delaware corporation formed on December 26, 2019 for purposes of entering into the merger agreement and consummating the transactions contemplated by the Merger Agreement. The company has not engaged in any business except for activities incident to its formation and in connection with the transactions contemplated by the merger agreement. Gary Stern serves as its sole officer and director. Upon consummation of

the merger, the stockholders of Asta Finance Acquisition, Inc. will be the members of the Stern Group—Gary Stern, Ricky Stern, Emily Stern, Arthur Stern, the Stern Family Trusts, Asta Group, Incorporated (owned by the Sterns), and GMS Family Investors LLC (solely managed by Rick Stern).

21. On April 8, 2020, the Company issued a press release announcing the Proposed Transaction, which stated in relevant part:

***Asta Funding, Inc. Announces Going Private Transaction***

***Price Represents a 36.9% Premium to the Closing Price on April 7, 2020***

ENGLEWOOD CLIFFS, N.J. – Asta Funding, Inc. (NASDAQ: ASFI) ("Asta" or the "Company") today announced that it has entered into a definitive merger agreement (the "Merger Agreement") under which the Stern Group, comprised of Gary Stern, Ricky Stern and certain related parties will acquire the outstanding publicly held shares of common stock of Asta through the merger of Asta with a wholly-owned subsidiary of Asta Finance Acquisition Inc. ("Parent"), with Asta surviving as a wholly-owned subsidiary of Parent (the "Merger").

Each share of outstanding common stock will be purchased for $13.10 in cash. The purchase price represents a premium of approximately 36.9% to Asta's closing stock price on April 7, 2020, the last trading day prior to this announcement.

The Merger was unanimously approved by the board of directors of Asta (the "Board"), acting on the unanimous recommendation of a special committee of independent directors (the "Special Committee") that was granted full authority to conduct a comprehensive strategic review and evaluate, and if warranted, negotiate an acquisition proposal.

The Merger will be financed by a committed loan facility provided by Bank Leumi USA.

The Merger is expected to close in Asta's third fiscal quarter of 2020 and is subject to the satisfaction of customary closing conditions as well as the approval by Asta's stockholders other than the Stern Group. The Asta Board recommends that Asta's stockholders vote to adopt and approve the Merger Agreement. Upon closing, Asta will become a privately held company and as such, the Company's shares of common stock will no longer be listed or traded on the Nasdaq Global Select Market.

22. On June 25, 2020, the Company issued a press release announcing the amendment to the Merger Agreement, which stated in relevant part:

**Asta Funding, Inc. Announces Amendment to Merger Agreement Providing for an Increase in Merger Consideration from $11.47 to $13.10**

**Price Represents an 18% Premium to the Closing Price on June 24, 2020**

Asta Funding, Inc. (NASDAQ: ASFI) ("Asta" or the "Company") today announced that it has entered into an amendment (the "Amendment") to the merger agreement (the "Merger Agreement") under which the Stern Group, comprised of Gary Stern, Ricky Stern and certain related parties, will acquire the outstanding publicly held shares of common stock of Asta through the merger of Asta with a wholly-owned subsidiary of Asta Finance Acquisition Inc. ("Parent"), with Asta surviving as a wholly-owned subsidiary of Parent (the "Merger"). The Merger Agreement was originally entered into on April 8, 2020.

The Merger Agreement originally provided that each share of outstanding common stock would be purchased for $11.47 in cash. However, pursuant to the Amendment, each share of outstanding common stock will be purchased for $13.10 in cash. The new purchase price represents an increase of $1.63 per share over the original purchase price and a premium of approximately 18% to Asta's closing stock price on June 24, 2020, the last trading day prior to this announcement.

The Merger Agreement and Amendment were approved by the board of directors of Asta (the "Board") (without the participation of Gary Stern), acting on the unanimous recommendation of a special committee of independent and disinterested directors (the "Special Committee") that was granted full authority to conduct a comprehensive strategic review and evaluate, and if warranted, negotiate an acquisition proposal.

The Company also entered into a voting agreement with RBF Capital, LLC, a stockholder of the Company. Pursuant to the voting agreement, which is required by the Amendment, RBF has agreed to vote all shares owned by it in favor of the Merger Agreement and Amendment.

The Merger will be financed by a committed loan facility provided by Bank Leumi USA.

The Merger is expected to close in Asta's fourth fiscal quarter of 2020 and is subject to the satisfaction of customary closing conditions as well as the approval by Asta's stockholders other than the Stern Group. The Asta Board recommends that Asta's stockholders vote to adopt and approve the Merger Agreement. Upon closing, Asta will become a privately held company and as such, the Company's shares of common stock will no longer be listed or traded on the Nasdaq Global Select Market.

//
//

**The Proxy Omits Material Information**

23.     On August 25, 2020, Defendants filed a materially incomplete and misleading Proxy with the SEC. The Individual Defendants were obligated to carefully review the Proxy before it was filed with the SEC and disseminated to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions. However, the Proxy misrepresents or omits material information that is necessary for the Company's shareholders to cast an informed vote in connection with the Proposed Transaction.

The Misleadingly Incomplete Financial Projections

24.     The Proxy omits critical financial projections from all versions of the forecasts provided for the overall Company, including: unlevered free cash flows, earnings before interest and taxes ("EBIT"), depreciation, change in working capital, and capital expenditures (the "Consolidated Projections"). Additionally, the Proxy omits the projections broken down by business segment, as provided to Lincoln for use in their valuation analyses, including the *Consumer Receivables Segment* projections, the *Personal Injury Claims Segment* projections, the *Social Security Disability Advocacy Segment* projections, the *Small Business Lending Segment* and the *Corporate Overhead* projections (the "Business Segment Projections" and together with the Consolidated Projections, the "Omitted Projections"). Defendants elected to summarize Asta Funding's projections in the Proxy, but they excised and failed to disclose the Omitted Projections—even though they were readily available for disclosure as illustrated by the April 8, 2020 and the June 19, 2020 Fairness Analysis presentations given by Lincoln to the Special Committee of the Board. By selecting to disclose only certain projections, Defendants rendered the summaries of the: projections tables, valuation analyses, and valuation picture of Asta Funding provided in the Proxy misleadingly incomplete.

25.     First, there are significant differences between unlevered free cash flow projections—widely recognized as the most important metric when it comes to valuing a company and its stock—and the net income projections that are included in the Proxy.[1,2,3] Net income is an arbitrary figure obtained after assuming certain accounting hypotheses regarding expenses and revenues. On the other hand, free cash flow is an objective measure, a single figure that is not subject to any personal criterion.[4] As a leading financial expert explains:

> The classic definition of net income (revenues for a period less the expenses that enabled these revenues to be obtained during that period), in spite of its conceptual simplicity, is based on a series of premises that seek to identify which expenses were necessary to obtain these revenues. This is not always a simple task and often implies accepting a number of assumptions. Issues such as the scheduling of expense accruals, the treatment of depreciation, calculating the product's cost, allowances for bad debts, etc., seek to identify in the best possible manner the quantity of resources that it was necessary to sacrifice in order to obtain the revenues. Although this "indicator", once we have accepted the premises used, can give us adequate information about how a company is doing, the figure obtained for the net income is often used without full knowledge of these hypotheses, which often leads to confusion.

---

[1]     "Morningstar's Approach to Equity Analysis and Security Valuation." *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners*. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 305. ("We use a discounted cash flow (DCF) approach to arrive at our intrinsic value estimates because it allows us to separate economic reality from accounting-based noise.").

[2]     Copeland, Thomas. *Financial Theory and Corporate Policy*. 3rd ed. 24. ("The main difference between the accounting definition and the economic definition of profit is that the former does not focus on cash flows when they occur, whereas the latter does… Financial managers are frequently misled when they focus on the accounting definition of profit…").

[3]     Brealey, Richard, Stewart Myers, and Franklin Allen. "The Value of Common Stocks." *Principles of Corporate Finance*. 10th ed. New York: McGraw-Hill Irwin, 2011. 80. ("This discounted-cash-flow (DCF) formula for the present value of a stock is just the same as it is for the present value of any other asset. We just discount the cash flows…. Notice that it is *not* correct to say that the value of a share is equal to the sum of the discounted stream of earnings per share.") (emphasis in the original).

[4]     Pablo Fernández, *Cash flow is a Fact. Net income is just an opinion*, (October 17, 2008), http://csinvesting.org/wp-content/uploads/2015/02/Cash-Flow-vs.-NI.pdf, also found as *Valuation Methods and Shareholder Value Creation*, Chapter 9 Cash Flow and Net Income, 2002 Academic Press, San Diego, CA.

*Id*. "Free cash flow is accurate because it shows the cash coming in and the cash going out whereas with net income, one has to worry about accrual accounting, non-cash charges such as depreciation and most importantly, heavy manipulation. The main advantage that free cash flow has over earnings is that it can't be manipulated as much."[5] Simply stated, net income is an accounting number used for reporting purposes, but free cash flow is the actual amount of cash available to investors used to value the company and should have been disclosed.

26. Second, although all under the Asta Funding umbrella, the Company has distinct business lines that are each subject to their own independent influences. But perhaps more important to Asta Funding shareholders, Lincoln valued each segment of the Company independently. Each of Lincoln's valuation analyses utilized the Business Segment Projections and valued a single business segment. The exclusive use of the Business Segment Projections by Lincoln indicates that they are the projections required to properly assess the fairness of the Merger Consideration and value of the Company. Thus, without the Business Segment Projections, it was impossible for shareholders to value their shares according to the approach favored by Defendants' own financial advisor, or even check that Lincoln's inputs and assumptions were reasonable. By lumping each of the separate segment projections into the consolidated summary, the Proxy skews the financial picture of the Company and prevents shareholders from seeing the effect of each set of independent influences.

27. In light of the significant differences between the Omitted Projections and the figures disclosed in the Proxy, the summaries of the projections tables and valuation analyses are misleadingly incomplete. By failing to include the Omitted Projections, the tables provide a

---

[5] David Thomas, *Why Free Cash Flow Is Better Than Earnings*, Shares and Stockmarkets, (July 29, 2013), https://sharesandstockmarkets.com/free-cash-flow-v-earnings/.

materially incomplete and misleading overall valuation picture of Asta Funding. Simply put, Omitted Projections are irreplaceable when it comes to fully and fairly understanding the value of the Merger Consideration.

28.     Unlike poker where a player must conceal his unexposed cards, the object of a proxy statement is to put all one's cards on the table face-up. In this case only some of the cards were exposed—the others were concealed. If a proxy statement discloses financial projections and valuation information, such projections must be complete and accurate. The question here is not the duty to speak, but liability for not having spoken enough. With regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths. Accordingly, Defendants have disclosed some of the projections but have omitted the most important metrics to shareholders facing a decision on the Proposed Merger. These omissions render the summary of projections included in the Proxy misleadingly incomplete.

The Misleadingly Incomplete Summary of Lincoln's Valuation Analyses

29.     The Proxy describes the Lincoln fairness opinion and the various valuation analyses performed in support of its opinion. Defendants concede the materiality of this information in citing Lincoln's fairness opinion and their valuation analyses among the "material" factors the Board considered in making its recommendation to Asta Funding shareholders. Proxy at 30; *see also* Proxy at 39 ("Set forth below is a summary of the material financial analyses in the June 19, 2020 Presentation reviewed by Lincoln with the Special Committee on June 19, 2020 in connection with rendering Lincoln's Opinion."). However, the summary of Lincoln's fairness opinion and analyses provided in the Proxy fails to include key inputs and assumptions underlying the analyses. Without this information, as described below,

Asta Funding shareholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on the Lincoln fairness opinion in determining how to vote on the Proposed Merger. *See* Proxy at 39 ("Considering the tables below without considering the full narrative description of Lincoln's financial analyses, including the methodologies and assumptions underlying such analyses, could create a misleading or incomplete view of such analyses."). This omitted information, if disclosed, would significantly alter the total mix of information available to Asta Funding shareholders.

30. In summarizing the Discounted Cash Flow Analyses prepared by Lincoln, the Proxy fails to disclose the following key information used in the analyses: (i) the unlevered free cash flows Lincoln used for the analyses; (ii) the actual inputs and assumptions underlying the various discount rate ranges, including the specific WACC/CAPM components; and (iii) the actual terminal values calculated for each analysis.

31. These key inputs are material to Asta shareholders, and their omission renders the summary of the Discounted Cash Flow Analyses incomplete and misleading. As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinion, in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, Fairness opinion, 55 Am. U.L. Rev. 1557, 1576 (2006). Such choices include "the appropriate discount rate, and the terminal value…" Id. As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars….This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult

> to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

Id. at 1577-78.

32. Without the above-omitted material information Asta shareholders are misled as to the reasonableness or reliability of Lincoln's analyses, and unable to properly assess the fairness of the Proposed Merger. This is especially true for the free cash flow projections, which are indisputably the most important input in the analyses. As such, these material omissions render the summary of the Discounted Cash Flow Analyses included in the Proxy misleading.

33. In sum, the omission of the above-referenced information renders the Proxy materially incomplete and misleading, in contravention of the Exchange Act and the Individual Defendants' duty of candor/disclosure. Absent disclosure of the foregoing material information prior to the Shareholder Vote, Plaintiff will be unable to cast an informed vote, and is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## CAUSES OF ACTION

### COUNT I
**(Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)**

34. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

35. Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection

of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

36. Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that proxy communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

37. The omission of information from a proxy will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

38. Defendants have issued the Proxy with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide critical information regarding, amongst other things: (i) the Company's financial projections; and (ii) the valuation analyses performed by Lincoln.

39. In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

40.     The Individual Defendants knew or were negligent in not knowing that the Proxy is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that Lincoln reviewed and discussed its financial analyses with the Board, and further states that the Board considered the financial analyses provided by Lincoln, as well as its fairness opinion and the assumptions made and matters considered in connection therewith.  Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement.  The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.  Indeed, the Individual Defendants were required to, separately, review Lincoln analyses in connection with their receipt of the fairness opinions, question Lincoln as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Proxy and review it carefully before it was disseminated, to corroborate that there are no material misstatements or omissions.

41.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Proxy.  The preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Proxy or failing to notice the material omissions in the Proxy upon reviewing it, which they were required to do carefully as the Company's directors.  Indeed, the Individual Defendants were

intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

42. Asta Funding is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Proxy.

43. The misrepresentations and omissions in the Proxy are material and Plaintiff will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II
**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

44. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

45. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Asta Funding, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

46. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or

shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

47.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

48.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

49.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

50.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

51.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT III
**(Against the Individual Defendants for Breach of Fiduciary Duty of Candor/Disclosure)**

52. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

53. By virtue of their role as directors and/or officers of the Company, the Individual Defendants directly owed Plaintiff and all Company shareholders a fiduciary duty of candor/disclosure, which required them to disclose fully and fairly all material information within their control when they seek shareholder action, and to ensure that the Proxy did not omit any material information or contain any materially misleading statements.

54. As alleged herein, the Individual Defendants breached their duty of candor/disclosure by approving or causing the materially deficient Proxy to be disseminated to Plaintiff and the Company's other public shareholders.

55. The misrepresentations and omissions in the Proxy are material, and Plaintiff will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote. Where a shareholder has been denied one of the most critical rights he or she possesses—the right to a fully informed vote—the harm suffered is an individual and irreparable harm.

56. Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

      A.      Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Proxy;

      B.      Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

      C.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

      D.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: September 9, 2020

**MONTEVERDE & ASSOCIATES PC**

By: */s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel: (212) 971-1341
Fax: (212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*